UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Marcia Marie Swanburg**

    **v.**                                       Case No. 11-cv-143-PB
                                                    Opinion No. 2012 DNH 071

**Michael J. Astrue, Commissioner**
**Social Security Administration**


**MEMORANDUM AND ORDER**

Marcia Marie Swanburg seeks judicial review of a decision by the Commissioner of the Social Security Administration ("SSA") denying her applications for disability insurance and supplemental security income benefits.  Swanburg contends that the Administrative Law Judge ("ALJ") who considered her application did not adequately assess the medical opinion of Swanburg's treating provider and that the ALJ's assessment of her mental residual functional capacity is not supported by substantial evidence.  For the reasons provided below, I grant Swanburg's motion to reverse the Commissioner's decision and remand the case for further administrative proceedings.

## I.   <u>BACKGROUND</u>[1]

Swanburg applied for disability insurance and supplemental security income benefits on December 2, 2008, when she was thirty-three years old.  She alleged a disability onset date of September 1, 2008, due to a variety of physical problems, as well as problems with depression, post-traumatic stress disorder (PTSD), mixed personality disorder, and panic attacks.  After obtaining her GED, Swanburg completed two years at a community college.  Her past work consisted of positions in real estate as a customer service agent, an escrow officer, and a relationship manager at a title company.

### A.   <u>Medical Evidence</u>

Swanburg first reported problems with depression in October 2008.  At the time, she was having problems with her teenage sons and her husband had left her.  She reported increased suicidal ideation and unhappiness with her living situation. Her doctor diagnosed Swanburg with bipolar disorder, and opined that she also may have borderline personality disorder and complex PTSD.  He recommended hospitalization.

Swanburg was hospitalized on October 19, 2008, for suicidal ideation.  She had cut herself with a steak knife the day prior

---

[1] The background information is taken from the parties' Joint Statement of Material Facts.  <u>See</u> L.R. 9.1(b).  Citations to the Administrative Transcript are indicated by "Tr."

to her admission.  Her global assessment of functioning (GAF)
score upon admission was 30-35.[2]  She was discharged on October
26, 2008, with a GAF of 50-55.[3]

Following her discharge, Swanburg's doctor noted that she
was doing well on a medication regimen.  She experienced some
anxiety, but medications helped calm her down.  At a follow-up
appointment in January 2009, however, Swanburg reported that she
had stopped taking two of her medications.  Tr. 309.  She did
not like the way one medication made her feel and did not think
the other one was working.  Id.  She also had not established
care with a counselor.  She denied feeling suicidal, was alert
and oriented, made good eye contact, and answered questions
appropriately.

In January 2009, Dr. Thomas Stearns examined Swanburg.  Tr.
302.  She complained of emotional lability, sleep disturbance,
obsessive rumination, anxiety, and fear.  She was able to

[2] A GAF of 31-40 indicates "[s]ome impairment in reality testing
or communication (e.g., speech is at times illogical, obscure,
or irrelevant) OR major impairment in several areas, such as
work or school, family relations, judgment, thinking, or mood
(e.g., depressed man avoids friends, neglects family, and is
unable to work . . .)."  Diagnostic and Statistical Manual of
Mental Disorders at 34 (4th ed. 2000) ("DSM-IV").

[3] A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat
affect and circumstantial speech, occasional panic attacks) OR
moderate difficulty in social, occupational, or school
functioning (e.g., few friends, conflicts with peers or
coworkers)."  DSM-IV at 34.

accomplish some daily tasks and to seek support from her grandmother.  Dr. Stearns encouraged Swanburg to push herself to engage in daily activities.  At a follow-up appointment later that month, Swanburg reported deterioration in her mood and a decline in her ability to engage in daily activities beyond taking care of her children.  Tr. 441.

Dr. Richard Root examined Swanburg on April 22, 2009, on behalf of the SSA.  He opined that Swanburg was capable of understanding and remembering simple instructions within a supportive work setting; maintaining communication and relationships with very supportive peers, supervisors, and family members; sustaining attention and concentration adequate to do simple tasks; and tolerating stress common to very supportive work settings.  Dr. Root opined that Swanburg would have difficulty coping with demanding and emotionally involved relationships; with handling difficult tasks, particularly ones involving levels of emotionality; and with competitive, emotionally demanding settings.  Dr. Root recommended that a guardian be appointed to help manage any funds awarded to Swanburg.

On May 8, 2009, Dr. Michael Schneider completed a mental residual functional capacity ("RFC") assessment on behalf of the SSA.  Based on his review of Swanburg's records, including Dr.

Root's report, Dr. Schneider concluded that Swanburg retained the ability to understand, remember, and carry out short, simple instructions without special supervision.  He further concluded that she could maintain adequate attention for such instructions and that she could complete a normal work week in an environment where supervision was not overly critical.  Dr. Schneider also found that Swanburg could interact appropriately with peers and supervisors and that she could accommodate changes in a work setting.

In August 2009, Swanburg had an appointment with Margaret Mayer, a licensed clinical social worker.  Ms. Mayer opined that Swanburg had a moderate limitation in carrying out activities of daily living, a mild to moderate limitation in her ability to cope with change, and a marked limitation in the area of interpersonal functioning.  Ms. Mayer also noted problems with concentration and task completion, as reported by Swanburg.  Ms. Mayer assigned a GAF of 48.[4]

The following month, Swanburg was hospitalized because she had cut herself following an argument with her husband. Subsequently, she went to the emergency room twice with

---

[4] A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 34.

complaints of depression secondary to family issues,
unemployment, and monetary problems.  During an emergency room
examination in October 2009, she was fully alert and oriented.
Her mood, affect, thought process, insight, and judgment at that
time were normal.  She was discharged in good condition.  During
her November emergency room visit, Swanburg cut herself while at
the hospital and had to be placed in restraints.  The
lacerations were superficial and appeared to have been inflicted
to gain attention.

From September 2009 until May 2010, Swanburg received
mental health treatment from Dr. Marianne Marsh at Monadnock
Family Services.  In October 2009, Dr. Marsh completed a bipolar
disorder mental health source document.  Dr. Marsh stated that
Swanburg suffered from severe psychiatric symptoms on a constant
basis and opined that Swanburg was "quite disabled" and unable
to work.  Tr. 490.  Specifically, she indicated that Swanburg
was severely limited in her ability to deal with work stress,
constantly limited in her ability to handle work demands, and
constantly limited in her ability to focus, organize, and timely
complete work tasks.  Id.  Dr. Marsh noted that Swanburg was
experiencing manic, hypomanic, depressive, and mixed episodes.
Id.  She opined that Swanburg could expect recurrence of these
symptoms even with treatment.  Id.  Her prognosis was that some

improvement in Swanburg's condition was possible, but that recovery was extremely unlikely.  Id.

During her October appointment with Dr. Marsh, Swanburg reported cutting herself, which she stated was caused by flashbacks of her mother abusing her.  Tr. 529.  She was suffering from insomnia due to nightmares and felt "like a loaded gun."  Id.  Cutting herself was the only way she could calm her PTSD.  Id.  Swanburg also told Dr. Marsh that she was waking up depressed and hopeless and that she wished she was dead.  Id.  She reported not wanting to leave the house out of fear that others would stare at her.  Id.  Dr. Marsh noted that Swanburg was exhibiting self-injurious behavior and was having suicidal ideation and urges to inflict harm on herself.  Id.  She was suffering from depression and experiencing panic, avoidance, intrusive memories, flashbacks, nightmares, insomnia, fatigue, hyperstartle/hypervigilance, and hallucinations.  Id.  Dr. Marsh indicated that Swanburg's symptoms were severe, that her condition had worsened, and that chronic suicidal ideation persisted.  Tr. 530.  Medications only partially alleviated her symptoms.  Id.

At the next month's appointment, Dr. Marsh noted that Swanburg was improving gradually, but her symptoms remained severe and the chronic suicidal ideation continued.  Tr. 527.

7

Swanburg was less depressed, but she continued to engage in self-injurious behavior.  Tr. 526.  Many of the symptoms Swanburg reported at the previous visit persisted, including intrusive memories, flashbacks, insomnia, and poor concentration.  Id.  Her anxiety also persisted and made her feel shaky.  Id.

In January 2010, Dr. Marsh noted that Swanburg's moderately severe symptoms of mental illness had worsened.  Tr. 524. Swanburg had decreased the dosage of a prescription medication she was taking, resulting in increased symptoms, mood irritability, and anger.  Id.  Her chronic suicidal ideation persisted, as did intrusive memories, flashbacks, nightmares, hyperstartle/hypervigilance, insomnia, and poor concentration. Tr. 523.

In February, Dr. Marsh noted that Swanburg had a recent stay at a mental health unit after a breakdown.  Tr. 502.  Prior to hospitalization, she was taking a lot of extra pills to "not think about anything" and to sleep.  Id.  She denied suicidal intent.  Tr. 503.  Dr. Marsh indicated that she continued to suffer from moderately severe symptoms of mental illness.  Id.

In March, Swanburg reported to Dr. Marsh that she was depressed often.  Tr. 499.  She had intermittent chronic ideation, some of which was "bad."  Id.  Panic continued, but it

8

was "not as bad as it used to be."  Id.  She reported no self-injurious behavior.  Id.  Her symptoms remained moderately severe, though an improvement was noted.  Tr. 500.

In April, Dr. Marsh noted that Swanburg was making good progress in treatment, but her symptoms remained moderately severe.  Tr. 497.  She continued to experience panic, avoidance, intrusive memories, flashbacks, hyperstartle/hypervigilance, and nightmares.  Tr. 496.  She reported no suicidal ideation or self-injurious behavior, but was self-conscious about scars on her arms from cutting.  Id.

On May 19, 2010, Dr. Marsh completed a mental impairment questionnaire.  Dr. Marsh indicated that she had seen Swanburg on a monthly basis since September 2009.  She assigned Swanburg a GAF of 33, and opined that Swanburg was making progress in treatment but was still "quite impaired."  Tr. 516.  According to Dr. Marsh, although Swanburg's prognosis was fair, she had a severe and persistent mental illness that would be present indefinitely.  She opined that Swanburg could not meet competitive demands in several areas required to perform unskilled work.  Specifically, she was unable to maintain attention for two hours at a time; work in coordination with or in proximity to others without being unduly distracted; perform at a consistent pace without an unreasonable number and length

of rest periods; respond appropriately to criticism from supervisors; and complete a normal workday and workweek without interruptions from psychologically-based symptoms.  Tr. 518. Dr. Marsh also indicated that Swanburg was seriously limited in her ability to understand, remember, and carry out very short and simple instructions; maintain regular attendance; deal with normal work stress; and respond appropriately to changes in a routine work setting.  Id.  Dr. Marsh further opined that Swanburg had marked limitations in carrying out activities of daily living and in social functioning, and a moderate limitation in her ability to maintain concentration, persistence, or pace.  According to Dr. Marsh, Swanburg would miss more than four days of work per month due to her condition. She noted, however, that Swanburg would be capable of managing her own benefits.

In June 2010, Swanburg began treatment with Dr. Frederick Agisim, who took over for Dr. Marsh when she left Monadnock Family Services.  At their first appointment, Dr. Agisim noted that Swanburg's mental health was stable with no suicidal ideation.  He indicated, however, that the symptoms of her mental illness continued to be moderately severe.  Tr. 669. Those symptoms included panic, irritability, avoidance, intrusive memories, flashbacks, hyperstartle/hypervigilance, and

nightmares.  Tr. 668.  She continued to benefit from treatment,
but was afraid to try to lessen the intensity of treatment or to
try to return to work.  Six days later, Swanburg was
hospitalized for cutting herself with a razor.  She was admitted
for treatment of her depression.

The following month, Dr. Agisim noted that Swanburg was
depressed and anxious.  Tr. 666.  She was avoiding going out and
using the telephone.  Id.  She reported feeling overwhelmed by
problems with money, her husband's refusal to sign divorce
papers, and criticism from her grandmother.  Certain medications
were helping her mood.  A typical day consisted of caring for
her personal needs, spending time with her children and
grandmother, or going to appointments.  Swanburg attended to
chores with her sons, prepared dinner, and participated in
family activities with her children.  Despite these activities,
Dr. Agisim opined that Swanburg had marked limitations in her
activities of daily living and her interpersonal functioning.
Specifically, he noted that Swanburg had inconsistent personal
hygiene, sleep disturbance, inconsistent budget management,
inadequate leisure activity, inconsistent use of community
resources, inconsistent medication management, as well as unsafe
medication and nutrition management.  Tr. 664-65.  Dr. Agisim
also noted that Swanburg was experiencing inconsistent rational

response to others, persistent isolation caused by symptoms,
inability to respond to stress systematically, inconsistent
follow-up with scheduled activities, and inconsistent ability to
establish trust.  Id.

**B.   Administrative Proceedings**

After her claim for benefits was denied at the initial
level, Swanburg requested a hearing before an ALJ.  Swanburg
attended the hearing on August 9, 2010, and testified.  She was
represented by counsel.  A vocational expert also testified.

The ALJ issued a decision denying Swanburg's claim on
September 24, 2010.  At step two of the sequential analysis, the
ALJ found that Swanburg had the severe impairments of status
post left knee surgery, bipolar affective disorder, and anxiety
disorder.  At step three, however, the ALJ found that Swanburg
did not have an impairment or a combination of impairments that
met or medically equaled a listing.  The ALJ went on to find
that she retained the RFC to perform light work involving
occasional postural activity.  Specifically, she retained the
ability to understand, remember, and carry out short and simple
instructions without special supervision; maintain adequate
attention; complete a normal workday and workweek; interact
appropriately with peers and supervisors; and accommodate
changes in a work setting.  The ALJ next found that Swanburg

could not perform any of her past relevant work, but that she
could perform other work existing in significant numbers in the
national economy.  Accordingly, the ALJ concluded that Swanburg
was not disabled for the purpose of her social security
application.  The ALJ's decision became the Commissioner's final
decision on January 20, 2011, after the Decision Review Board
failed to complete a timely review.


### III.  ANALYSIS

Swanburg moves to reverse and remand the decision denying
her applications for disability insurance and supplemental
security income benefits on the grounds that the ALJ did not
adequately assess the medical opinion of Swanburg's treating
provider, and that the ALJ's assessment of Swanburg's mental RFC
is not supported by substantial evidence.  The Commissioner
defends the ALJ's decision.

### A.   Weight Given to Treating Provider's Opinion

Swanburg contends that the ALJ erred in giving only limited
weight to the medical opinion of her treating provider, Dr.
Marsh, or, alternatively, that he failed to adequately explain
why Dr. Marsh's opinion was not entitled to controlling weight.

A treatment provider's opinions must be given controlling
weight if the "treating source's opinion on the issue(s) of the

13

nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ." 20 C.F.R. § 404.1527(d)(2). The ALJ "may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors." Coggon v. Barnhart, 354 F.Supp.2d 40, 52 (D. Mass. 2005) (internal quotation marks and citations omitted); see 20 C.F.R. § 404.1527(d)(2).

When a treating physician's opinion is not entitled to controlling weight, the ALJ determines the amount of weight based on factors that include the nature and extent of the physician's relationship with the applicant, whether the physician provided evidence in support of the opinion, whether the opinion is consistent with the record as a whole, and whether the physician is a specialist in the field. 20 C.F.R. § 404.1527(d)(1-6). Importantly, the ALJ must give "good reasons" for the weight given to treating physician's opinions. Id.; see SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) ("[The ALJ's decision] must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence

14

in the case record, and must be sufficiently specific to make
clear to any subsequent reviewers the weight the adjudicator
gave to the treating source's medical opinion and the reasons
for that weight.")

Here, the ALJ failed to give a good reason for giving only
"limited weight" to the opinion of Dr. Marsh, Swanburg's
treating provider.  Dr. Marsh opined that Swanburg's persistent
and severe mental illness prevented her from meeting competitive
demands in several areas required to perform unskilled work.
The ALJ justified giving her opinion limited weight by stating
that the limitations found by Dr. Marsh were inconsistent with
her own treatment records.  Tr. 15.  To demonstrate the
inconsistency, he cited to treatment records in Exhibit 18F.
Id.  As the Commissioner concedes, however, those records are
not Dr. Marsh's treatment notes but Dr. Agisim's, who began
treating Swanburg after Dr. Marsh left the practice.

Dr. Marsh's treatment notes in fact support her opinion
that Swanburg's mental condition improved following her multiple
hospitalizations for self-cutting, but that she continued to
suffer from symptoms of severe mental illness.  Even when Dr.
Marsh noted improvement in Swanburg's condition, she also
indicated that Swanburg's chronic suicidal ideations persisted,
and that medications only partially alleviated her symptoms.

15

Treatment notes from each session also indicate that Swanburg's symptoms were moderately severe.  Therefore, Dr. Marsh's opinion that Swanburg was making progress but continued to suffer from a severe and persistent mental illness is entirely consistent with her treatment notes.

Dr. Agisim's treatment records are also consistent with Dr. Marsh's opinion.  In June 2010, Dr. Agisim noted that Swanburg's symptoms were moderately severe, but that her mental illness was stable.  As the ALJ noted, however, Swanburg was hospitalized six days later after cutting herself with a razor.  She was admitted for treatment of her depression.  The following month, Dr. Agisim indicated that Swanburg was depressed, anxious, and in withdrawal.  He also noted that Swanburg had marked limitations in activities of daily living and interpersonal functioning.

In sum, Dr. Marsh and Dr. Agisim's treatment records support rather than contradict Dr. Marsh's opinion.  The ALJ provided no other reason for giving only limited weight to Dr. Marsh's opinion.  The ALJ, therefore, failed to give a good reason for discounting her opinion, as he was required to do.  See 20 C.F.R. § 404.1527(d)(1-6); SSR 96-2p, 1996 WL 374188, at *5.

16

**B.**   **Mental RFC**

To support his conclusion that Swanburg retained the mental RFC to do light, unskilled work, the ALJ relied on the opinions of state agency consultants, Dr. Root and Dr. Schneider.  Social Security Ruling 96-6p provides that state agency consultants' opinions

> can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the . . . consultant . . . .

SSR 96-6p, 1996 WL 374180, at *2.  "[T]he amount of weight that can properly be given the conclusions of non-testifying, non-examining physicians will vary with the circumstances, including the nature of the illness and the information provided the expert."  Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994) (internal quotation marks and citations omitted).  A state agency consultant's opinion that is based on an incomplete record, when later evidence supports the claimant's limitations, cannot provide substantial evidence to support the ALJ's decision to deny benefits.  See, e.g., Alcantara v. Astrue, 257 Fed. Appx. 333, 334 (1st Cir. 2007); Padilla v. Barnhart, 186 Fed. Appx. 19, 21 (1st Cir. 2006); Russell v. Astrue, 742 F.

Supp. 2d 1355, 1378-79 (N.D. Ga. 2010); L.B.M. ex rel. Motley v. Astrue, No. 1:08-cv-1354-WTL-DML, 2010 WL 1190326, at *13 (S.D. Ind. Mar. 23, 2010).

Here, the ALJ failed to adequately explain why the agency consultants' opinions were entitled to "most weight." Instead, he simply stated that their opinions "are well supported by medically acceptable clinical and diagnostic techniques and are not inconsistent with the other substantial evidence in the record." Tr. 15. As explained in a similar case, "[m]ore than a conclusory declaration is necessary, particularly given the fact that the opinions of the nonexamining physician and claimant's treating physician are so dramatically different." Mendoza v. Astrue, 2011 WL 1770486, at *5 (D.N.H. May 10, 2011).

It also bears noting that the state consultants rendered their opinions before Dr. Marsh even began treating Swanburg. Thus, as in Mendoza, the state consultants did not have the benefit of the treating provider's notes and opinions or the opportunity to explain their reasons for discounting them. See id. Hence, without further explanation by the ALJ, "it is difficult to accept [the state consultants' opinions] as being 'consistent with and supported by the evidence of record,' or to understand why [they are] entitled to 'significant weight[.]'" Id.

18

In light of the ALJ's inadequate explanation for discounting Dr. Marsh's opinion and his unsupported decision to give greater weight to the agency consultants' opinions, the case must be remanded for further proceedings.

## IV.   CONCLUSION

For the foregoing reasons, I grant Swanburg's motion to reverse (Doc. No. 8), deny the Commissioner's motion to affirm (Doc. No. 10), and pursuant to 42 U.S.C. § 405(g), remand this case to the Social Security Administration.  The clerk is directed to enter judgment accordingly.

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge


April 10, 2012

cc:  D. Lance Tillinghast, Esq.
     T. David Plourde, AUSA

19